## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TERENCIA RIDENHOUR, DANIDSHA AYALA, CAROLINA CARRION, SHAKIMA N. GLOVER, DIANE LUKOWSKI, AMY OTIS, KRISTIE RICKER, WENDY SERRANO, and MELISSA RIDDLE individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**TIMOTHY LARSON**, Commissioner of the Connecticut Office of Higher Education, **SEAN SEEPERSAD**, Division Director of Academic Affairs, **MANISHA JUTHANI**, Commissioner of the Connecticut Department of Public Health, and **CHRIS ANDRESEN**, Section Chief for Practitioner Licensing and Investigations.<br><br>*Defendants*. | Civil Action No. 3:23-cv-1672<br><br>**TRIAL JURY DEMANDED**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DECEMEBER 26, 2023 |

### CLASS ACTION COMPLAINT

1.     Plaintiffs Terencia Ridenhour, Danidsha Ayala, Carolina Carrion, Shakima N. Glover, Diane Lukowski, Amy Otis, Kristie Ricker, Wendy Serrano, and Melissa Riddle ("Plaintiffs"), are former students of Career Training Specialists, LLC d/b/a Stone Academy ("Stone Academy"). They bring this action on behalf of themselves and all others similarly situated (collectively referred to as the "Proposed" or "Putative" Class or "Class Members") against state officials at the Connecticut Office of Higher Education ("OHE") and the Connecticut Department of Public Health ("DPH") for violating the Class Members' rights under the Fourteenth Amendment to the United States Constitution.

2.      Defendants TIMOTHY LARSON, Commissioner of OHE, MANISHA JUTHANI, Commissioner of DPH, SEAN SEEPERSAD, OHE's Division Director of Academic Affairs, , and CHRIS ANDRESEN, DPH's Section Chief for Practitioner Licensing and Investigations (collectively referred to as "Defendants"), individually, and in concert with one another, deprived Plaintiffs of their property rights in academic credits earned by them and awarded while enrolled in the practical nursing program at Stone Academy.  Defendants' illegal and *ultra vires* conduct has denied Plaintiffs the fruits of their hard work, forever tarnished their professional reputations, and interfered with their pursuit of career advancement in the nursing field.

3.      Stone Academy is a "private occupational school" ("POS") that offered a Practical Nursing (PN) program at three campus locations in Connecticut until its closure in February 2023.  Plaintiffs and members of the putative class were students in Stone Academy's PN program prior to its closure.  At all times up to and including Stone Academy's closure, it was authorized to operate by both the OHE and the DPH.  Defendants' authorization permitted Stone Academy to enroll students, teach courses, award academic credit and confer nursing degrees upon Plaintiffs.

4.      Following Stone Academy's closure, Defendants undertook an unauthorized auditing process of the transcripts of Stone Academy students who had been enrolled on or after November 1, 2021. In a report of its findings issued in July, 2023, Defendants declared approximately 76% of the Plaintiffs' earned and awarded credits to be "invalid."  Plaintiffs had no involvement in, and no ability to appeal the audit. Defendants thereby denied Plaintiffs, and members of the putative class, their property rights in these credits, including their ability to use them in pursuit of becoming licensed practical nurses ("LPNs").

2

5.      As part of this government overreach, the DPH Defendants, Juthani and Andresen, also impermissibly withheld, for months following Stone Academy's closure, licenses for Stone Academy graduates who passed the National Council Licensure Exam ("NCLEX"). The NCLEX is the nationwide exam adopted by the State of Connecticut as the objective measure of a nursing student's ability to practice competently and safely as an LPN.  Defendants impermissibly imposed an obligation to take a refresher course, even though issuance of a license is mandatory after passage of the NCLEX.

6.       Defendants not only exceeded their authority by retroactively invalidating earned and awarded credits, but also contradicted their mandatory obligations to accept the credits and degrees awarded by an authorized private nursing program, and to issue licenses to students who passed the NCLEX licensing exam.

**A.      Defendants**

7.      Defendant Timothy Larson is the Commissioner of the OHE.  OHE has authority to license private educational institutions like Stone Academy that offer practical nursing programs.  Defendant Larson is sued in both his individual and official capacities.

8.      Defendant Sean Seepersad is the Division Director of Academic Affairs at OHE. Seepersad was responsible for decisions and communications regarding Stone Academy students.  Defendant Seepersad is sued in his individual capacity.

9.      Defendant Manisha Juthani is the Commissioner of the DPH.   DPH has authority to investigate complaints, evaluate performance and determine subject matter compliance of practical nursing programs offered by private educational institutions like Stone Academy. Defendant Juthani is sued in both her individual and official capacities.

10.     Defendant Chris Andresen is the Section Chief for Practitioner Licensing and Investigations at DPH. Andresen was responsible for decisions and communications regarding Stone Academy graduates, including their licensure.  Defendant Andresen is sued in his individual capacity.

11.     The Defendants share responsibility for the regulation of PN programs.  They do not have authority to retroactively declare invalid course credits that are issued while any school is operating under State authorization. Nor do they have authority to withhold licenses to graduates who passed their NCLEX exam.

**B.     Plaintiffs**

### Plaintiff Terencia Ridenhour

12.     Plaintiff Terencia Ridenhour ("Ridenhour") is a resident of Waterbury, Connecticut.

13.     Ridenhour is a Certified Nursing Assistant (CNA) and has worked in the medical field since she was sixteen years old. Among other positions, Ridenhour has been a companion, a medication administrator, and a group home supervisor.

14.     Ridenhour is also a wife and a mother. In 2021, she decided to enroll in a Practical Nursing program at Stone Academy in order to advance her career prospects and provide a better life for her family. Ridenhour planned to earn a degree in Practical Nursing so that she could use it to "bridge over" and become a Registered Nurse (RN). After researching local Practical Nursing programs online, Ridenhour decided to enroll in Stone Academy.

15.     Ridenhour began attending classes at Stone Academy on or about August 31, 2021. She was enrolled as a fulltime student at the school's Waterbury campus. Although her family

struggled to secure housing, Ridenhour took out student loans and paid $28,000 in tuition to Stone Academy.

16.    While battling homelessness, Ridenhour excelled academically at Stone Academy. She earned straight A's and expected to graduate with High Honors. Ridenhour expected to graduate in July 2023 and attend the school's "pinning ceremony" where she would receive recognition for her hard work and academic achievement.

17.    Defendants have never provided her with any audited transcript, thereby creating a *de facto* invalidation of all of her earned credits and depriving her of her property right to those credits.

### Plaintiff Danidsha Ayala

18.    Plaintiff Danidsha Ayala ("Ayala") is a resident of Waterbury, Connecticut.

19.    As a child, Ayala spent a considerable amount of time in hospitals because of her family's history of health problems. Ayala dreamt of becoming a nurse, but her family's financial situation prevented her from pursuing a traditional education.

20.    Instead, Ayala joined the Army National Guard. After her military service, she returned home to Connecticut in February 2022. Only a month later, Ayala lost her mother to gun violence. In the wake of this tragedy, Ayala took in and cared for her younger sister, a minor child.

21.    While caring for her younger sister, Ayala decided to pursue her dreams. She applied to the Practical Nursing program at the Porter and Chester Institute. Unfortunately, her start date was postponed due to the COVID-19 Pandemic and Ayala decided to enroll at Stone Academy.

22.    Ayala began classes on or about September 13, 2022. She was enrolled as a fulltime student at the school's Waterbury campus. Ayala had to borrow approximately $13,200 to pay her tuition to Stone Academy. She expected to graduate in June 2024.

23.    Defendants have never provided her with any audited transcript, thereby creating a *de facto* invalidation of all of her earned credits and depriving her of her property right to those credits.

### Plaintiff Carolina Carrion

24.    Plaintiff Carolina Carrion ("Carrion") is a resident of East Hartford, Connecticut.

25.    Carrion has a bachelor's degree from Central Connecticut State University. She currently works as a Medical Assistant and Patient Care Associate and Patient Administrative Associate at Hartford Hospital.

26.    In 2021, Carrion decided to advance her career and enroll in a Practical Nursing program. Like many other students, Carrion planned to earn a degree in Practical Nursing so that she could use it to "bridge over" and become an RN.

27.    Carrion began classes on or about August 30, 2021. She was enrolled as a fulltime student at the school's East Hartford campus.

28.    Carrion paid more than $11,000 out of pocket to attend Stone Academy and borrowed another $9,500 to pay her tuition. She expected to graduate in July 2023.

29.    As a result of the State audit conducted after Stone Academy's closure, certain of Carrion's earned and awarded academic credits were declared invalid, depriving her of her property right to those credits.

### Plaintiff Shakima N. Glover

30.    Plaintiff Shakima N. Glover ("Glover") is a resident of White Plains, New York.

31.    Glover has multiple degrees, including a business degree. She is currently a Unit Coordinator at a hospital in White Plains, New York.

32.    Glover previously worked as a CNA at a nursing home in White Plains, New York. The experience inspired her to return to school and enroll in a Practical Nursing program. Glover planned to earn a degree in Practical Nursing so that she could use it to "bridge over" and become an RN.

33.    Glover enrolled in Stone Academy and began taking classes in October 2019. She was enrolled as a fulltime student at the school's West Haven campus. She would commute to school from White Plains, New York on a weekly basis.

34.    Glover paid more than $7,500 out of pocket to attend Stone Academy. Although she originally expected to graduate in 2021, Glover's graduation was delayed due to the COVID-19 Pandemic.

35.    Defendants have never provided her with any audited transcript, thereby creating a *de facto* invalidation of all of her earned credits and depriving her of her property right to those credits.

### *Plaintiff Diane Lukowski*

36.    Plaintiff Diane Lukowski ("Lukowski") is a resident of Wolcott, Connecticut.

37.    Lukowski has earned a number of degrees, including her associate's and bachelor's degrees. She is also a CNA with a Basic Life Support certification.

38.    In 2021, Lukowski decided to advance her career and enroll in a Practical Nursing program. She intended to use the Practical Nursing degree to "bridge over" and become an RN.

39.    Lukowski began attending classes on or about August 20, 2021. She enrolled as a part-time student at the school's Waterbury campus. Lukowski borrowed approximately $28,000 to pay her tuition to Stone Academy. She expected to graduate in July 2023.

40.    As a result of the State audit conducted after Stone Academy's closure, certain of Lukowski's earned and awarded academic credits were declared invalid, depriving her of her property right to those credits

### Plaintiff Amy Otis

41.    Plaintiff Amy Otis ("Otis") is resident of Manchester, Connecticut.

42.    Otis currently works as a medical assistant.

43.    In 2021, she decided to advance her career and enroll in a Practical Nursing program. She chose Stone Academy.

44.    Otis began attending classes on or about October 26, 2021. She was enrolled as a part-time student at the school's East Hartford campus. She had to borrow thousands of dollars to pay her tuition to Stone Academy. She expected to graduate in September 2023.

45.    As a result of the State audit conducted after Stone Academy's closure, certain of Otis's earned and awarded academic credits were declared invalid, depriving her of her property right to those credits.

### Plaintiff Kristie Ricker

46.    Plaintiff Kristie Ricker ("Ricker") is a resident of Manchester, Connecticut.

47.    Ricker is a CNA and currently works at Vernon Manor Health Care Center.

48.    In 2020, Ricker decided to advance her career and enroll in a Practical Nursing program.

49.    Ricker enrolled and began classes at Stone Academy in March 2020. She was enrolled as a part-time student at the school's East Hartford campus. She originally expected to graduate in January 2021. However, due to insufficient clinical staffing, her expected graduation date got delayed to December 2022. Ricker sat for her exit exam, but the school's closure prevented her from getting her degree and her practical nursing license.

50.    As a result of the State audit conducted after Stone Academy's closure, certain of Ricker's earned and awarded academic credits were declared invalid, depriving her of her property right to those credits.

### *Plaintiff Wendy Serrano*

51.    Plaintiff Wendy Serrano ("Serrano") is a resident of Waterbury, Connecticut.

52.    Serrano currently works at Hartford Healthcare. Serrano previously attended Stone Academy in 2005 but withdrew from the school in order to care for her young children. When time permitted, she returned to Stone Academy and earned her Medical Office Professional certificate in July 2007.

53.    In 2022, Serrano decided to further her education and improve her work opportunities. She again enrolled in Stone Academy to pursue a Practical Nursing degree. She began classes on or about September 13, 2022.

54.    She was enrolled as a part-time student at the school's Waterbury campus. In order to pay for tuition, Serrano had to borrow more than $40,000. She expected to graduate in July 2024.

55.    Defendants have never provided her with any audited transcript, thereby creating a *de facto* invalidation of all of her earned credits and depriving her of her property right to those credits.

*Plaintiff Melissa Riddle*

56.    Plaintiff Melissa Riddle ("Riddle") is a resident of Meriden, Connecticut.

57.    Riddle currently works at Bradley Home and Pavilion as an LPN.

58.    In 2020, Riddle decided to pursue her dream and advance her career and enroll in a Practical Nursing program.

59.    Riddle enrolled and began classes at Stone Academy in August 2020. She was enrolled as a part-time student at the school's West Haven campus. She originally expected to graduate in July of 2022. However, due to insufficient clinical staffing, her expected graduation date got delayed. Riddle sat for and passed her exit exam.

60.    In March 2023, Riddle sat for and passed her NCLEX.  Although she was entitled by law to receive her Practical Nursing license, Riddle was coerced by DPH under threat of investigation to take a refresher course as a condition of receiving her license.  Because the first available refresher course was not until October 2023, issuance of her license was delayed for almost seven months.

61.    As a result of the State mandated course and DPH's unlawful conduct, Riddle was unable to work as an LPN for seven months, and is hesitant to seek new employment because of the stigma the State has imposed on her degree.

**C.    Jurisdiction and Venue**

62.    This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. § 1331 because all of the claims arise under the United States Constitution.

63.    Venue properly lies in this District in accordance with 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred within the District of Connecticut.

D.      **Facts**

**Operation of Private Occupational Schools ("POS") Offering Practical Nursing Degrees**

64.      Stone Academy was a POS before it closed. The authorization of a POS is governed by Connecticut General Statutes ("C.G.S.") Sections 10a-22a to 10a-22o. A POS is defined as an: "entity offering instruction in any form or manner in any trade, industrial, commercial, service, professional or other occupation for any remuneration, consideration, reward or promise of whatever nature, except 'private occupational school' shall not include (A) instruction offered under public supervision and control; (B) instruction conducted by a firm or organization solely for the training of its own employees or members; or (C) instruction offered by a school authorized by the General Assembly to confer degrees."

65.      A POS applies to the Commissioner of OHE to receive a certificate of authorization to operate. No person or entity shall offer instruction in any form or manner unless it first receives from the commissioner a certificate authorizing the occupational instruction to be offered.

66.      By regulation, a renewal of the certificate of authorization, if granted, shall be for a period not to exceed five years. No POS shall operate for more than five years from the date of a renewal without the completion of an evaluation.

67.      Pursuant to C.G.S Section 10a-22k, the Board of Governors of Higher Education is empowered to adopt regulations to carry out the purposes of C.G.S. Sections 10a-22a to 10a-22o.

68.      Because Stone Academy was a POS offering a PN degree, it was further subject to regulation under nursing statutes and regulations administered by both the Board of Examiners for Nursing ("BOEN") and the DPH.

69.      Pursuant to C.G.S Sections 20-90(a) through (c), the BOEN and DPH are empowered, as follows:

(a) The Connecticut State Board of Examiners for Nursing shall have the following duties: (1) Hear and decide matters concerning suspension or revocation of licensure; (2) adjudicate complaints filed against practitioners licensed under this chapter and impose sanctions where appropriate; (3) approve schools of nursing in the state that prepare persons for examination under the provisions of this chapter; and (4) consult, where possible, with national recognized accrediting agencies when approving schools pursuant to subdivision (3) of this subsection. The board may adopt a seal.

(b) All schools of nursing in the state that prepare persons for examination under the provisions of this chapter, shall be (1) visited periodically by a representative of the Department of Public Health who shall be a registered nurse or a person experienced in the field of nursing education, and (2) approved by the Connecticut State Board of Examiners for Nursing pursuant to subdivisions (3) and (4) of subsection (a) of this section.

(c) The Department of Public Health shall post a list of all nursing programs and all programs for training licensed practical nurses that are approved by the Connecticut State Board of Examiners for Nursing and maintain the standard for the education of nurses and the training of licensed practical nurses as established by the Commissioner of Public Health on the department's Internet web site.

70. Nursing statutes and regulations provide for, among other things, procedures for assessing and remediating underperforming PN programs. In particular, DPH regulation Section 20-90-47(b) permits "Full Approval of a PN program based on evidence that the program is meeting the educational outcomes as demonstrated by acceptable level of graduate performance," as defined in the regulations.

71. An acceptable level of a program's graduates' performance shall be defined as: "demonstrated mastery of nursing principles as evidenced by an average passing rate of at least 80% of students taking the licensing examination prescribed pursuant to Section 20-92 of the Connecticut General Statutes, upon their first attempt after graduation, as reported from May 1 to April 1" and "evaluation of graduates' achievement of the educational outcomes required by Section 20-90-53 or 20-90-56, as applicable, of the Regulation of State Agencies, in a manner approved by the [BOEN]."

72.    PN programs are generally reviewed once every five years.  If deficiencies are discovered during those reviews, or at any time, the program can be placed on the status of conditional approval during which the program is to undertake an action plan to remediate any deficiencies.  If a program fails to do so, the BOEN may make a recommendation, after a full hearing, to the DPH and/or OHE to take certain action up to, and including, the possibility of closure.

73.    Programs under Full Approval or Conditional Approval are empowered and authorized to enroll students, teach curriculum, award academic credits and confer degrees.

74.    The licensing exam adopted by the State of Connecticut for the Licensing of PNs and evaluation of PN programs is referred to as the NCLEX exam (National Council Licensure Exam).  The NCLEX is developed, updated and administered by the National Council of State Boards of Nursing ("NCSBN").  NCSBN is dedicated to developing psychometrically sound and legally defensible nurse licensure and certification examinations consistent with current entry-level practice.

75.    NCLEX is the premiere licensure exam in the country, used by every State in the country.  NCSBN uses computerized adaptive testing (CAT) technology to deliver the exam, ensuring a valid and reliable measurement of nursing competence.  The passing standard for the NCLEX is the cut point at which the minimum ability is determined to require safe and effective practice nursing at the entry level.  Review of the passing standards for the NCLEX are conducted every three years.

76.    A student who completes the course requirements of a PN program, and passes the final exam for that program, is entitled to sit for the NCLEX exam.  Any person who passes the NCLEX **must** be conferred a license to practice as a PN in the State of Connecticut.  Licensure is

mandatory under the state regulatory scheme after passage of the NCLEX, as the NCLEX is the paramount measure of nursing competency.

77.    In circumstances when a student does not pass the NCLEX on the first attempt, there are refresher courses available at various PN programs, including formerly at Stone Academy, to assist the student in passing on a subsequent attempt.

**Stone Academy's Closure and Defendants' Post-Closure Conduct**

78.    After November, 2021, Stone Academy was engaged in ongoing dialogue with Defendants about the performance of its PN programs.  One indicator of challenges at Stone Academy's PN programs were aggregate passing rates on the NCLEX of below 80%.

79.    During the calendar year 2022, OHE participated in site visits to Stone Academy's campuses, as did DPH in December 2022, in response to the substandard test scores.  The investigation resulted in the issuance of a letter dated December 20, 2022 from the Commissioner of OHE placing Stone Academy on notice that the revocation of the school's authorization is under consideration based on enumerated alleged failures to meet minimum requirements of State statutes and regulations.  The letter scheduled a compliance conference for January 9, 2023.

80.    Following the January 9, 2023 compliance conference attended by Stone Academy's representative and owner, Joseph Bierbaum, DPH and OHE, the participants in the meeting negotiated and executed an agreement to conduct an audit (the "Audit Agreement").  The Audit Agreement, executed on January 26, 2023 by Stone Academy and DPH, and by OHE on January 27, 2023, was intended to identify problem areas for the purpose of providing Stone Academy with the opportunity to remedy them.  The audit was to be paid for by Stone Academy.

81.     In order to permit the audit to proceed, by letter dated January 19, 2023, the Commissioner of OHE extended Stone Academy's most recent certificate of authorization from January 26, 2023 to March 27, 2023.

82.     Stone Academy reneged on its agreement to pay for the audit and, instead, during a February 3, 2023 call with OHE, notified OHE of its intent to close the school, even though the certificate of authorization was extended until March 27, 2023.

83.     By letter dated February 14, 2023, Stone Academy notified Plaintiffs of its decision to close.

84.     Although the closure eliminated any possibility of fixing Stone Academy's program going forward, Defendants decided, nonetheless, to proceed with an audit of Plaintiffs' transcripts.  The audit considered approximately 800 students who Stone Academy advised were "active" at the time of closure.  During the process, the auditors identified and audited an additional 200 students who had been enrolled at any time on or after November 1, 2021.  OHE also identified another approximately 40 students who were active, but for whom there were insufficient records provided by Stone Academy for them to be audited.

85.     Defendant Larson, in a statement to WNPR, claimed that the audit was to confirm for the students "what coursework has been bona fide and they'll know what clinical hours were actual."

86.     Defendants commenced the audit process by hiring an outside private consultant. OHE released the results in July 2023. The audit declared "invalid" approximately 77,000 of 102,000 clinical and other hours that had been completed by members of the class even though this coursework had been performed during the period that Stone Academy had a valid certification from the OHE.

87.     In the audit, Defendants claimed the following basis for invalidating Plaintiffs credits: (1) lack of adequate record keeping, including missing, incomplete and/or illegible attendance sheets; (2) courses taught with a student/faculty ratio of higher than 10-1; (3) courses taught by unqualified faculty; and (4) clinicals conducted on campus or remotely.

88.     Defendants had no legal basis, nor was it otherwise authorized in either statute or regulation, to retroactively declare invalid credits that had been conferred upon Plaintiffs by Stone Academy while Stone Academy was authorized by Defendants to operate.  The audit itself was also based on criteria that was unsupported in any statute or regulation, most blatantly the conclusion that credits could be invalidated merely because Stone Academy had failed to keep records that were satisfactory to DPH and OHE.

89.     Following the audit, Defendants provided audited transcripts to most of the Plaintiffs and putative class.  Each transcript identified those classes that were declared invalid, by changing the previously awarded credits to zero credits.  The audited transcripts also indicated, on an aggregate basis, the number of credits that were being declared invalid.

90.     Several Plaintiffs and members of the putative class never received their audited transcripts, *de facto* invalidating all of the credits those students earned.

91.     Defendant Larson further demeaned Stone Academy students' preparedness and knowledge when he stated in a press release: "Unfortunately, these audited transcripts demonstrate Stone Academy was not providing most of its students with the education they need to be prepared to take the NCLEX or practice as an LPN."

92.     In a further overreach by Defendants, in April, 2023, while the audit was in process, they also attempted to impose upon several hundred nursing students who had been enrolled at

Stone Academy on or after November 1, 2021 and **had passed the NCLEX**, the obligation to take a forty-eight-hour refresher course as a condition of continuing to practice as an LPN.

93.    The imposition of "a refresher course" that was concocted by Defendants serves as an acknowledgement that they did not have the authority to retroactively declare earned and awarded credits invalid or to deny Plaintiffs the right to practice, once they passed the NCLEX and were issued a license. Defendant Andresen, in sworn testimony, said "we had Stone Academy graduates who graduated, and the program was approved at the time, who passed the NCLEX. So, they were entitled to a license."

94.    On or about April 18, 2023, DPH issued a document to Plaintiffs entitled "Supplemental Information for LPN License Applicants Who Graduated From Stone Academy On Or After November 1, 2021."   The first sentence of this documents states "When the Department of Public Health (DPH) issues a professional license, that license serves as proof to employers and to the public that the person holding the license has met all the standards required by state law and regulation to practice competently and safely in each license category."

95.    Yet, based on what the State referred to as "a recent review of Stone Academy's Practical Nurse (PN) program" DPH, through Defendant Juthani and Defendant Andresen, cited "several educational concerns that call into question whether recent graduates from Stone Academy received the learning and training experiences required to practice successfully as a Licensed Practical Nurse (LPN)."   It specifically cited concerns about "supervised direct clinical care experiences."

96.    Using this as a pretext to interfere with their licenses, DPH purported to offer a so-called "voluntary" option to receive a "free training refresher course" on condition that "these

applicants **must** sign a stipulated agreement with DPH which will limit the use of their LPN license until the refresher course is completed." (emphasis added).

97.     Representatives of DPH also called Stone Academy graduates who passed their NCLEX exam to further pressure them to take the refresher course.

98.     DPH, however, lacked authority to impose the condition because, as it acknowledged in the document, "DPH is required by law to issue an LPN license to applicants after they have passed the NCLEX." That is consistent with the well-settled regulatory standard that the NCLEX is the "paramount measure of nursing competency."

99.     Defendant Andresen, in a public webinar, in response to Stone Academy graduates inquiring why they cannot receive their licenses despite passing the NCLEX, said "there's two components to being licensed [as an LPN], one is the successful completion of a program approved by the Board of Examiners for Nursing, and the second one is passing the NCLEX exam." At all time for these graduates, Stone Academy was an approved program. Mr. Andresen falsely implied otherwise.

100.    Despite DPH's claim, the process was hardly voluntary, as it was made under threat of investigation. In response to the question as to what would happen if an applicant did not agree to sign a stipulation, DPH admonished that "given the concern that the Stone Academy program may have failed to provide you with the learning and training experiences required to become licensed as a practical nurse, DPH may open an investigation into your preparation and may take disciplinary action against your license if the investigation reveals that you did not receive the preparation required by state law and regulation. Such disciplinary action could result in the loss of your license and would be reported to the National Practitioner Databank."

101.    At the time of the issuance of the "Supplemental Information for LPN License Applicants Who Graduated From Stone Academy On Or After November 1, 2021" document, no refresher courses were immediately available for graduates, causing significant delay.

102.    This after-the-fact overreach severely damaged all of the Plaintiffs, whose accomplishments at Stone Academy, passage of the NCLEX, and professional licenses were diminished and stigmatized, and their reputations forever tarnished.

103.    Without any evidence of substandard performance in their employment as LPNs, DPH has opened approximately fifty investigations into the academic records of students who declined to sign the stipulation.  These supposed investigations have sat fallow, with nothing having been actually investigated in the many months that the files have been open.  They hang over the heads of these licensed practical nurses despite having earned their PN licenses.

104.    Students who did sign the stipulation were required to wait approximately seven months after passing the NCLEX exam to even receive their license, significantly more time than the forty-eight-hour refresher course DPH implied.

105.    Defendants have no authority to retroactively declare invalid earned and awarded academic credits from a State accredited private nursing program, any more than they can *de facto*, retroactively, burden a properly issued nursing license based on review of a Plaintiff's prior academic record.

106.    Defendants undertook these unauthorized and *ultra vires* actions without providing Plaintiffs and members of the putative class with an opportunity to participate in the process, to object to the conclusions or to otherwise appeal from the determinations.  Defendants explicitly informed Plaintiffs and member of the Putative class that they "will not accept additional supplementation" of records from students, despite acknowledging that Stone Academy was

deficient in its record keeping. Defendants simply imposed their unauthorized actions on Plaintiffs by sending them copies of "audited" transcripts and publishing the audit findings to Plaintiffs and the public.

107.    As a result of these actions, Defendants have caused significant damage to the property rights of Plaintiffs and the putative class, in their academic credits, practical nursing degrees and practical nursing licenses. Students who were unable to graduate prior to Stone Academy's closure have been unable to transfer any credits, audited or unaudited, to Porter and Chester Institute or Lincoln Technical Institute, the two largest schools offering PN programs in the State of Connecticut. Stone Academy students who did graduate and passed their licensing exam were unable to practice for months as the DPH withheld their licenses.

<b>CLASS ALLEGATIONS</b>

**A.    Class Definition**

108.    Plaintiffs, on behalf of themselves, and all those similarly situated, define the Putative Class in this litigation to include, as follows:

> Any person who, at any time on or after November 1, 2021, was enrolled in any of the day or night nursing programs offered by Stone Academy.  This definition includes both the day and night programs at the Waterbury, East Hartford, and West Haven school locations; and
>
> Any person who passed the NCLEX exam and, under threat of investigation, was coerced to take a forty-hour refresher course as a condition to issue, or otherwise practice pursuant, a practical nursing license.

109.    Excluded from the class are the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of the appellate court(s).

**B.**     **Certification Requirements**

110.     This action is suitable for resolution on a class-wide basis under the requirements of Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23.

111.     <u>Numerosity and Ascertainability</u>: This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of all Class members is impracticable.  The class is ascertainable and identifiable from the records of both Defendants and Stone Academy. Those records demonstrate that the class is composed of at least over 1,000 members.

112.     <u>Commonality</u>: This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. These common issues include, but are not limited to:

    a.  whether Defendants lacked the authority to declare invalid educational credits awarded by an approved private educational institution;

    b.  whether Defendants violated the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs of their property rights to earned academic credits.

    c.  Whether Defendants violated the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs of their liberty rights to their good name, reputation, honor, and integrity.

113.     <u>Typicality</u>: This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the other class members.  Plaintiffs and the other class members have been injured by the same wrongful conduct. Plaintiffs' claims arise from the

same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

114.    <u>Adequate Representation</u>: This action satisfies Fed. R. Civ. P. 23(a)(4), as the Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the financial resources to do so. Plaintiffs' counsel are experienced and qualified in prosecuting class action cases. Neither Plaintiffs, nor their attorneys, have any interests conflicting with class members' interests.

115.    <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

**First Cause of Action**

**(42 U.S.C. Section 1983 - Violation of Procedural Due Process Under the Fourteenth Amendment to the United States Constitution)**

116.    Plaintiffs repeat and realleged each and every allegation in paragraphs 1 through 115 of the complaint as if fully set forth herein.

117.    Defendants, at all times relevant to this action, were acting under color of state law.

118.    Plaintiffs have a protected property right under the Fourteenth Amendment to the United States Constitution to their academic credits and practical nursing degrees conferred upon them by Stone Academy.

119.    Defendants unlawfully deprived Plaintiffs of their property rights to their academic credits and degrees conferred upon them by Stone Academy without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

120.    Defendants engaged in an audit process of Plaintiffs' academic transcripts beyond authority conferred on them by statute and regulations of the State of Connecticut, and in direct contravention of Connecticut law that authorizes POSs to enroll students, teach courses, award academic credits and confer degrees while authorized to operate by the State.

121.    At all times to and including its closure in February, 2023, Stone Academy was authorized by Defendants to operate.

122.    At no time did Defendants provide Plaintiffs, or members of the putative class, with the opportunity to participate in the audit process, or to otherwise contest its findings.  They were not given notice of any right to a hearing, the ability to provide input as to their particular academic circumstances, or provided any right of appeal.

123.    Defendants unilaterally engaged in their *ultra vires* audit process, determined its criteria, and declared invalid Plaintiffs' academic credits, all of which was imposed upon Plaintiffs.

124.    Defendants similarly imposed a burden on validly issued licenses of former Stone Academy students who had passed the NCLEX, without the right to be heard or to appeal, in direct contravention of State licensing procedures that are mandatory – namely that practical nursing licenses must be issued to nursing students who pass the NCLEX.

125.    Defendants' *ultra vires* and unlawful conduct as described above were the direct and proximate cause of the constitutional deprivation suffered by Plaintiffs.

126.    As a result of Defendants' conduct, Plaintiffs have suffered significant damages.

**Second Cause of Action**

**(42 U.S.C Section 1983 - Violation of Liberty Interest Under the Fourteenth Amendment to the United States Constitution – Stigma-Plus)**

127.    Plaintiffs repeat and realleged each and every allegation in paragraphs 1 through 115 of the complaint as if fully set forth herein.

128.    Defendants, at all times relevant to this action, were acting under color of state law.

129.    Plaintiffs have a protected liberty interest under the Fourteenth Amendment to the United States Constitution to their good name, reputation, honor, and integrity.

130.    Defendants have made defamatory statements about the education and preparedness of Plaintiffs and their abilities to competently and safely practice as LPNs.

131.    Such defamatory statements were published to the general public, including to other schools offering PN programs, and both current and prospective employers.

132.    By their statements and actions, Defendants published to other schools offering PN programs, and both current and prospective employers, that the academic credits conferred by Stone Academy were invalid, should be treated as having no value, and that Plaintiffs were ill prepared to practice as practical nurses.

133.    As a result of these defamatory statements, Plaintiffs were and are stigmatized. Porter and Chester Institute and Lincoln Technical Institute adopted these defamatory statements and declined to accept any credits, audited or otherwise, of former Stone Academy students.

134.    At no time did Defendants provide Plaintiffs, or members of the putative class, with the opportunity to contest these statements.  They were not given notice of any right to a hearing, the ability to provide input as to their particular academic circumstances, or provided any right of appeal.

135.    Defendants similarly imposed a burden on validly issued licenses of former Stone Academy students who had passed the NCLEX, without the right to be heard or to appeal, in direct contravention of State licensing procedures that are mandatory – namely that practical nursing licenses must be issued to nursing students who pass the NCLEX.

136.    As a result of Defendants' statements and conduct, Plaintiffs have suffered reputational harm and significant damages.

### Third Cause of Action

### (42 U.S.C Section 1983 - Violation of Substantive Due Process Under the Fourteenth Amendment to the United States Constitution)

137.    Plaintiffs repeat and realleged each and every allegation in paragraphs 1 through 115 of the complaint as if fully set forth herein.

138.    Defendants, at all times relevant to this action, were acting under color of state law.

139.    Plaintiffs have a protected property right under the Fourteenth Amendment to the United States Constitution to their academic credits and practical nursing degrees conferred upon them by Stone Academy.

140.    Defendants unlawfully deprived Plaintiffs of their property rights to their academic credits and degrees conferred upon them by Stone Academy in violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution.

141.     Defendants engaged in an audit process of Plaintiffs' academic transcripts beyond authority conferred on them by statute the regulations of the State of Connecticut, and in direct contravention of Connecticut law that authorizes POSs to enroll students, teach courses, award academic credits and confer degrees while authorized to operate by the State.

142.     At all times, to and including its closure in February, 2023, Stone Academy was authorized by Defendants to operate.

143.     Plaintiffs had a fundamental right to rely on credits and degrees conferred upon them by Stone Academy while authorized by Defendants to operate.

144.     Defendants engaged in arbitrary and oppressive government action in auditing Plaintiffs' academic transcripts, retroactively declaring invalid their earned and awarded academic credits, and burdening their validly issued practical nursing licenses.

145.     Upon information and belief, the *ultra vires* conduct described above had never before been undertaken by Defendants concerning any other group of practical nursing students.

146.     Defendants unilaterally engaged in an *ultra vires* audit process, determined its criteria, and declared invalid Plaintiffs' academic credits, all of which was imposed upon Plaintiffs, as was the unlawful burdening of licenses already conferred upon prior Stone Academy students.

147.     Defendants' *ultra vires* and unlawful conduct as described above were the direct and proximate cause of the constitutional deprivations suffered by Plaintiffs.

148.     As a result of Defendants' conduct, Plaintiffs have suffered significant damages.

**Prayer For Relief**

Accordingly, on behalf of themselves and the putative class, the Plaintiffs respectfully request entry of a judgment:

(a)     awarding Plaintiffs and the Class Members compensatory damages for the loss of the value of their earned academic credits, that have been improperly been declared invalid;

(b)     awarding Plaintiffs' and the Class Members compensatory damages for damage to their professional reputations caused by the stigma created by the unauthorized audit process and retroactive invalidation of earned academic credits;

(c)     awarding Plaintiffs' and the Class Members compensatory damages for being deprived the opportunity to participate in or appeal the "audit;"

(d)     awarding Plaintiffs and those Class Members who passed the NCLEX exam compensatory damages for having a cloud placed on their licenses;

(e)     entering an order requiring Defendants to discontinue the investigation of any Plaintiff who passed the NCLEX and declined to sign a stipulation to take a forty-eight-hour refresher course and forever enjoining Defendants from investigating former Stone Academy students based on their academic records;

(f)     ordering Defendants to reimburse the Plaintiffs their reasonable litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(g)     granting such other relief it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

Respectfully submitted,

By:   */s/ David A. Slossberg*

David A. Slossberg (# ct13116)
Kristen L. Zaehringer (# ct27044)
Erica O. Nolan (# ct31097)
Timothy C. Cowan (# ct30786)
HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
147 North Broad Street
Milford, CT  06460
(203) 877-8000
DSlossberg@hssklaw.com
KZaehringer@hssklaw.com
ENolan@hssklaw.com
TCowan@hssklaw.com